Collins and others vs. Case, impleaded, etc.

*Estoppel* in pais. — *Principal and agent.*

1. In an action to compel defendant to account to plaintiffs for money subscribed and paid by them, and which he, as their agent, was to invest in

Collins and others vs. Case, impleaded, etc.

lands to be owned by the subscribers as a company, the defendant is not estopped from denying that he has received the whole amount of said subscriptions, by the fact that in a report made to the subscribers he stated that he had received the whole ; no one of them having advanced any money or changed his position in consequence of such statement.

2. In the purchase of the land as such agent, defendant could not lawfully obtain any advantage or make any profit for himself inconsistent with the interests of his principals. And if, by any secret arrangement with the vendors of the land, under protense of commissions to be paid him by them, or otherwise, he obtained it for a less sum than was expected by the subscribers or represented by himself, he must account for the difference.

3. Defendant himself being a subscriber, and retaining his interest in the property of the company as if his subscription were actually paid, he must account for the amount of it as well as for that of other subscriptions actually paid.

APPEAL from the Circuit Court for *Racine* County.

This action was brought by *Henry Collins* and thirty others against *Jerome I. Case* and sixteen others, to compel an accounting by *Case* for all moneys received by or for him upon certain subscriptions, made by him and the other defendants and by the plaintiffs, to a fund for the purchase of certain oil lands and leases, said *Case* having been appointed by the subscribers to said fund their agent and trustee to receive the conveyances of such lands for them ; and also to have *Case* removed from his said office and employment as such agent and trustee, and that a receiver might be appointed of all the lands, property and effects belonging to the plaintiffs and defendants, and "constituting the fund subscribed and contributed by them," and that *Case* might be adjudged to convey, assign and deliver all the lands and leases so purchased and acquired by him, and all money or property remaining in his hands belonging to the plaintiffs and the other defendants ; that the rights and interests of the plaintiffs and said defendants respectively therein might be ascertained and declared by the court, and the receiver directed to make conveyances and payments thereof to said plaintiffs and defendants respectively according to their

respective interests therein; and that *Case* might be temporarily restrained, etc.; and for general relief. *Case* answered, denying that any sum whatever remained due from him as such agent. The specific allegations of the pleadings need not be stated more fully here; as the questions at issue will sufficiently appear from the finding and opinion of the circuit judge. The testimony, which was extremely voluminous, will also be omitted.

The circuit judge found the following facts: 1. On or about the 1st of May, 1865, at the city of Racine, a contract or subscription was entered into by the parties plaintiff and defendant in this action, of the following tenor: " We, the undersigned, agree to pay the sums set opposite our respective names, for the purpose of purchasing from Messrs. Goddard, Steers & Co., 2,500 acres of oil lands in fee simple, and 2,500 acres of oil leases, the same to be selected from 20,000 acres of fee and lease interests owned by said Goddard, Steers and others, on the tributaries of the Great Kanawha, in West Virginia. The conditions of the subscriptions are such, that if the land shall prove satisfactory to a committee to be appointed by the subscribers to examine them, then this subscription to be binding; but otherwise of no effect. The price to be paid for said land is $20 per acre for both fee and lease interests, or $100,000 to all." [Subscribed " Case and Knapp, $20,000," and by the other parties to the action in various sums ranging from $500 to $5,000.] 2. Afterward it became apparent that subscriptions to said contract to the amount of $100,000, could not be obtained, and thereupon, about the 1st of May, aforesaid, at said city of Racine, it was agreed by and between said subscribers to close the subscription, and that they should pay into a common fund the sums by them severally subscribed, and that the fund so raised should be invested in the purchase of so much of the lands and leases aforesaid as such fund would pay for at the price before mentioned, one-half to be lands pur-

chased in fee, and the other half leasehold interests. 3. On the 2d of May, 1865, the defendant *Case* was appointed by the subscribers to said fund their agent and trustee, to receive from said subscribers the money so subscribed, and pay it over to Messrs. Goddard, Steers & Co., and take the title to the lands so to be purchased, in his own name, but in trust for the use and benefit of said subscribers; and *Case* accepted the trust, and entered on the discharge of his duties as such trustee. 4. Prior to this, viz., about March 4, 1865, *Case* had entered into an agreement with Goddard, Steers & Co., in pursuance of which he afterward entered into their service for the purpose of procuring subscriptions to said fund; and in consideration of such agreement, Goddard, Steers & Co. agreed to pay him for said services, ten per cent on the amount of the subscriptions to said fund, in case such subscriptions amounted to $100,-000. Said agreement was existing and in full force at the time *Case* accepted his appointment as trustee of said subscribers, but said subscribers had at that time no knowledge thereof. *On his settlement with Goddard, Steers & Co., Case was allowed by them $3,000 as his commissions, and compensation for his services* in procuring subscriptions to said fund, in pursuance of said agreement. 5. Four of the subscribers to said fund, to wit, *Wickham, Palmeter, Selden,* and the firm of McDougall & Nichols, gave *Case*, as such agent and trustee, their promissory notes for certain sums in part payment of their subscriptions, the total amount of such notes being $4,000; and *Case was authorized by the subscribers to the fund to take said notes, and the same are the property of said subscribers.* 6. *Case* was directed by said subscribers to collect said notes, but has never collected any part thereof, except the sum of $470. 7. Of the subscriptions to said fund, the sum of $39,170 was actually paid in cash by the subscribers to *Case*, as trustee, and by him paid to Goddard, Steers & Co.; and the finding specifies the persons by whom such payments were made, with the amounts

paid by them severally. 8. The sum of $25,800 of such subscriptions was never paid to or received by *Case* [including the sum of $10,000 subscribed by the defendant *Knapp*, and various sums subscribed by other defendants, whose names are mentioned in the finding, with the sums by them severally subscribed and *not* paid to *Case*.] But said amounts were paid to Goddard, Steers & Co. directly. 9. At a meeting of the subscribers to said fund, at Racine, July 12, 1865, *Case* reported to them his acts and doings as their trustee; and he then *reported to them that he had purchased for them of Goddard, Steers & Co., 1,800 acres of land in fee simple, and leases for 1,800 acres of land, in West Virginia, for which he had paid to Goddard, Steers & Co.* $72,000; that he had paid defendant *Kimbark* for the services of an attorney in going to West Virginia and examining the titles to said lands, $455; that he had charged for his own expenses and time, $96.50; that he had paid for recording said deeds and leases, $15.75; that he had paid certain persons for selecting said lands, each $157.48, making his total expenditures $72,882.21. He further *reported that he had received in cash from the subscribers to said fund* $76,000, leaving a balance in his hands of $3,117.79. Said report was accepted and adopted by the subscribers to said fund. 10. *Case* has actually paid to the said fund, on account of his own subscription thereto, $10,000; he has actually received from the subscribers $49,170.17, including his own subscription; he has actually paid out on account of said fund, for taxes on the lands purchased by him, $90; has actually paid out, on account of said fund for various other purposes named in the ninth finding, $882.21; has actually paid to Goddard, Steers & Co., on account of said fund, $39,787.96; and has now in his hands, belonging to said fund, and for which he is accountable to said subscribers, $8,410.

Upon the above facts, the court held: 1. That plaintiffs are entitled to an account, as prayed. 2. That a receiver be ap-

pointed, to whom *Case* shall transfer the titles to all the lands and interests in lands in West Virginia belonging to the subscribers to said fund; that the same be held in trust for the use and benefit of said subscribers, and be divided among them in the proportion that their several subscriptions bear to the whole amount subscribed; that *Case* pay to said receiver the above mentioned sum of $8,410; that said moneys be held by the receiver in trust, and be divided among the subscribers in the proportions above mentioned.    3. That *Case* is not liable to account to said subscribers for the unpaid balance of the said notes taken by him from some of the subscribers in part payment of their subscriptions.    4. That *Case* transfer said last mentioned notes to the receiver, who shall hold them for the use and benefit of the subscribers, the proceeds to be distributed among them in the proportions above mentioned.    5. That *Case* is not liable to account to said subscribers for the amount of the subscriptions which were never paid to him, and which are described in the eighth finding of fact.    6. That *Case* is liable to account and pay over to said receiver, for the use and benefit of said subscribers, the sum of $8,410 (mentioned in the tenth finding of fact), with interest thereon from July 12, 1865, to be divided among said subscribers in the manner above described; and that he pay the costs of this action.

*Case* excepted to so much of the ninth finding of fact as is printed above in italics; to the first two and the last two clauses of the tenth finding; and to the first, second and seventh conclusions of law.    The plaintiffs excepted: 1. To so much of the fourth finding of fact as declares that *Case* was allowed in his settlement with Goddard, Steers & Co., only $3,000 as commission, they claiming that the court should have found that he was allowed at least $20,000.    2. To so much of the fifth finding as declares that *Case* was authorized by the subscribers to the fund to take the notes there mentioned, and that the same are their property.    3. To the seventh finding so far as it declares

that *Case* paid $39,170.17 to Goddard, Steers & Co., and that this was all the money paid to him on the subscription. 4. To every part of the sixth and eighth findings, and to all of the tenth finding except what relates to the two sums of $90 and $882.21. 5. To the third, fourth and fifth conclusions of law. 6. To all the first conclusion from and including the words " that the same be held," etc. 7. To all of the sixth conclusion, except what relates to the costs.

The following is the opinion (in an abbreviated form) of the circuit judge, referred to in the opinion of Chief Justice DIXON:

" The complaint avers that all the subscriptions to the fund of the association *have been fully paid.* The revised list of subscribers, which appears in the proceedings of the meeting of May 22, 1865, in connection with the appointment of *Case* as agent or trustee, shows the total amount of the subscriptions to have been $76,000. *Case's* answer substantially admits that all these subscriptions have been paid. The other defendants, by their failure to answer, admit the same fact. It follows that the question of fraud in the inception of this association, and in procuring such subscriptions and the payment thereof (upon which a large amount of testimony has been taken), is entirely out of the case. The plaintiffs claim that this whole amount of $76,000 was paid to *Case;* that he purchased the lands for a much less sum than the subscribers had agreed between themselves to pay for them; and that there is a large unexpended balance in his hands, for which he is liable to account to them. He was their trustee to collect the subscriptions and take the title to the lands; and, although he was authorized to pay $20 per acre for them, if he bought them for a lower price and retained any of the funds of the association in his hands, it will be conceded that he must account to the association for the funds so retained. On the other hand, he claims that he paid for proper expenses, and for the lands at the stipulated price, all that he received, including his own subscription, and more, and that he has no money in his

hands in which the subscribers have any interest. And while admitting that the whole $76,000 was paid, he claims that about one-half of it was paid directly to Goddard, Steers & Co., by the subscribers, and that only the balance was ever received by him."

" The principal questions are: How much of this fund ever came into *Case's* hands? And what amount of it has he expended?"

"As to the notes taken by *Case* on subscriptions, and remaining unpaid, plaintiffs contend that the taking of them was unauthorized, and that he must account for the amount of them as cash. It appears that *a large number* of the subscribers gave notes for part of their subscriptions; from which circumstance, I think the authority of *Case* in the premises may be fairly inferred. Further, I am clearly of the opinion that the action of the subscribers at their meeting in January, 1866, instructing *Case* to collect these notes, is a ratification of his act in taking them. It is true, he has not obeyed those instructions, but it does not appear that the subscribers have suffered any loss by reason of such neglect; and if they have, this action is not brought to recover such loss. I conclude, therefore, that *Case* is not liable to account for the amount of these notes remaining unpaid, as cash in his hands."

" It appears from the pleadings and evidence, that *Case* received from subscribers on account of subscriptions, $38,700 (exclusive of his own subscription of $10,000); and that he received on the note of McDougal & Nichols $470.17, amounting in all to $39,170.17. It also appears that certain subscriptions and parts of subscriptions amounting to $25,800, were *not* received by *Case*." [The opinion here recites the list of these subscriptions, being the same mentioned in the eighth finding of fact, *supra*.]

" The plaintiffs contend that he is liable for the whole amount, because, as they allege, at the meeting of July 12, 1865, which

was after he had paid Goddard, Steers & Co., and taken con-
veyances of the lands, he reported to the subscribers that he
had received the whole amount of these subscriptions, and
receipted therefor, or at least for a portion thereof; and they
insist that he is thereby estopped from denying that he did in
fact receive the whole thereof; and that, not having paid the
amount to Goddard, Steers & Co., he must account therefor.
I do not understand that the law of estoppel goes to that extent.
I think the law is, that if *Case* made any representations on
which the subscribers acted, he cannot afterward be permitted
to deny the truth of such representations, to the injury of those
who acted upon them. But no one acted upon the strength of
such report and receipts. The subscription was already closed,
the money paid, and the lands conveyed; and no further action
was taken by any of the subscribers. Hence, no one could
possibly be injured by allowing the report and receipts to be
explained, or even the truth of them to be denied. *Case* was
appointed to collect the subscriptions and pay them over to
Goddard, Steers & Co. If subscribers paid their subscriptions
directly to that firm instead of making their payments through
*Case*, and if, by a very common commercial fiction, the firm
receipts to him, and he to the subscribers, for the sums thus
paid, who is the loser by the transaction? As to one of these
subscriptions, however, viz.: that of *Knapp* for $10,000, there
are some circumstances which require special consideration. It
is urged by the plaintiffs that *Case* frequently represented to
persons who afterward became subscribers, that he was to
furnish, or was furnishing, *Knapp* with means to pay his sub-
scription; that this representation was one of the inducements
which led them to subscribe; that no money was paid Goddard,
Steers & Co., on account of that subscription, and, therefore, it
must be held that *Case* has the amount in his hands, and must
account therefor. The complaint avers, that the subscriptions
of *Case* and *Knapp* were for $10,000 each, not jointly for

$20,000, as some of the evidence tends to show it to have been. The parties are bound by that averment; and the liability of *Case* on account of *Knapp's* subscription is precisely the same as it would be on account of any other subscription concerning which he had made the same representations. What is the extent of that liability? *Knapp* was under no obligation to get the means from *Case* to pay his subscription. He may have had the means himself; or he may have been able to procure them elsewhere on more favorable terms. *Case* could not force him to take the money, nor could he pay his subscription without his consent. Besides, it was of no importance to the other subscribers whether *Case* did or did not pay *Knapp's* subscription, if it was only paid. I think, therefore, that the most that can be claimed against *Case* by reason of these representations is, that he was bound to see that *Knapp's* subscription was paid; which in fact was done. I conclude that *Case* is not chargeable with any portion of this $25,800. As to his liability upon his own subscription of $10,000, it is proved that he represented to many who subsequently became subscribers, that his subscription was on the same footing with all others; that he was paying it in cash, dollar for dollar, and other similar statements; and there can be no doubt that numbers subscribed, and paid their money on the strength of these representations. The belief that he would pay his own subscription in cash was evidently the principal element that gave vitality to the enterprise. It is evident that he appreciated this fact from his keeping his arrangement with Steers [Goddard, Steers & Co.] a profound secret. With this knowledge, and without informing the subscribers of his real relations to them, he accepted the appointment as their trustee. Immediately after his appointment, a large trust fund was paid into his hands for the purposes specified in his appointment. His plain duty was to pay into that trust fund the amount of his subscription. The duty was so plain, that a court of equity cannot permit him to say that he

did not do it. It is no answer to this to say that he made no arrangement with Steers *after* his appointment as trustee. That arrangement was a continuing one, which culminated, and the profits of which he received, after he accepted the appointment as trustee for the subscribers. The two relations were utterly irreconcilable; and when he accepted the trustee-ship without disclosing to the subscribers his true relations with Steers, he forfeited the right to assert the existence of those relations, or to reap any benefit therefrom. It follows that he must be held to account for the full amount of his own subscription as cash. It appears from the evidence that he paid a portion of it to Steers in cash and notes. I think the evidence will justify me in finding that the sum so paid was $1,500. The evidence also shows that on the balance, $8,500, no money was paid, but that Steers allowed him $3,000 as commissions for procuring subscribers, and that *Case* trans-ferred to Steers $5,500 of his subscription, and in that manner the $8,500 was adjusted. There is no legal reason why *Case* should not be allowed to make a sale of his stock in the asso-ciation to Steers, if such sale was *bona fide*, and not a part of the original secret agreement with Steers. *Case* being bound to account for the whole amount of his subscription, the burden is upon him to show that the transfer of this stock to Steers was an independent and *bona fide* transaction; and this, I think, he has failed to do. From the testimony, I think either that the $5,500 constitutes a part of the commission which *Case* stipulated for in his contract with Steers, or that, by threaten-ing to return the money to the subscribers if Steers would not take the $40,000 cash, more or less, and convey the full com-plement of the lands, he induced Steers to do so, and the stock was transferred to close up the business. It is immaterial which of these is the correct theory. But if both are errone-ous, still, *Case* having failed to explain the transaction, the transfer of the stock to Steers does not entitle him to a credit

for the amount in his account with the subscribers. [The judge then considers the evidence as to the amounts lawfully paid out by *Case* in the excution of his trust, and states the account as it stated in the tenth finding of fact, *supra*.] And, inasmuch as *Case* did not report any balance in his hands when he made his report to the meeting of the stockholders, July 12, 1865, but compelled them to bring this action to demonstrate that there was such a balance, he must be charged with interest on that balance ($8,410) from that date. And for the same reason he must pay the costs of this action."

Judgment for the plaintiffs in accordance with the conclusions of law above stated; and both the plaintiffs and defendant *Case* appealed.

*C. W. Bennett*, with *H. L. Palmer*, of counsel, for the plaintiffs.

*John W. & A. L. Cary*, for *Case*.

Dixon, C. J. Cross appeals from the same judgment; which judgment, we think, must be affirmed on both appeals, for the reasons given by the judge of the circuit court in the able opinion filed by him when the cause was there decided. The correctness of the judgment will at once appear when we consider the nature of the action. The complaint charges the defendant *Case*, in his capacity of agent, with having collected and received from the subscribers, including his own subscription, a large sum of money, only a portion of which was paid out by him in the purchase of the lands and in the necessary incidental expenses, and the residue fraudulently appropriated to his own use. The object of the action, and the sole object, is to compel him to account for and pay over to the parties in interest the money so fraudulently appropriated to his own use. It is an action to compel him to account for the money paid in by the subscribers, assuming their subscriptions to have been fairly and honorably obtained, and is not, therefore, an action charging him

Vol. XXIII. — 16

with fraud or deceit in procuring the other subscribers, or any of them, to become such and to pay in their money. Such an action from its nature would be an action at law, and not a suit in equity. The fraud here charged was *after* the subscriptions were made, and consists alone in the secret agreement entered into between the defendant and the owners of the land, by which the defendant was, under pretense of commissions to be paid by the owners to him, or otherwise, enabled to procure the title at a less price than was supposed by the other subscribers, or than was represented by him to them. And we furthermore observe that there is nothing in the complaint charging the defendant with fraud or negligence in the collection of the subscriptions, or with fraudulently procuring any other subscriber to be relieved from the payment of his subscription, or to be let in as an apparent subscriber in good faith without such payment. The complaint charges that each subscriber paid over to the defendant the amount of money set opposite his name in the subscription list; and the questions at issue are, whether the subscribers did so, or what sums of money were so paid over to him; and of those sums what amount, if any, has been wrongfully appropriated to his own use by reason of the alleged secret and corrupt agreement between him and the owners of the land.

It is true that the complaint, in addition, charged that the defendant, in his report to the subscribers in July, 1865, represented all or nearly all of the subscriptions as having been paid. But it is obvious, as the circuit judge says, that there was nothing in that transaction to constitute an estoppel. It was at most a mere misrepresentation or false statement as to his past dealings with the company. No one has advanced money or changed his position on account of that statement.

Bearing in mind, then, that the issues presented by the pleadings are, as to what sums of money have actually come to the hands of the defendant in the course of his agency, and whether they have all been duly and properly accounted for, it

will be seen that the circuit judge was correct when he said that a very large part of the testimony received was totally irrelevant and could not be considered. The plaintiffs having, therefore, by their pleadings, restricted themselves to a recovery of their share of the money actually paid in to the defendant and not disbursed by him on account of the company or for its benefit, the only difficult question arising is, as to whether the defendant's own subscription must be considered as so much money paid in or held by him for the use of the company. In the purchase of the land he was acting strictly in the capacity of agent, and as such was bound to a faithful and honest discharge of his duties. He could obtain no advantage or make no profit for himself inconsistent with the interests of his principals. He was made agent on the faith of his being a *bona fide* subscriber, having paid in, or holding in his own hands for the use of the company, the money represented by his subscription. He retains his interest in the property of the company, or his shares of the stock, the same as if his subscription had been actually paid in. If he is permitted to do so without the payment of his subscription, then it is manifest that he will have gained, by means of his agency, a very considerable private advantage at the expense of his principals, and quite contrary to their interest, which he was bound to subserve. For these reasons we think that he was correctly required to account for his own subscription as so much money paid in and held by him as agent, and that the judgment of the circuit court should be affirmed.

*By the Court.* — Judgment affirmed.